IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

ANDREA SNIDER,                           :        Case No. 1:24-cv-195
                                         :
            Plaintiff,                   :        Judge Matthew W. McFarland
                                         :
      v.                                 :
                                         :
BROWN COUNTY, OHIO, et al.,              :
                                         :
            Defendants.                  :

## ORDER AND OPINION

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 17). Plaintiff filed a Response in Opposition (Doc. 21), to which Defendants filed a Reply in Support (Doc. 22). After considering Plaintiff's request, the Court does not find oral argument necessary. *See* S.D. Ohio Civ. R. 7.1(b)(2). Thus, this matter is ripe for the Court's review. For the following reasons, Defendants' Motion for Summary Judgment (Doc. 17) is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

Plaintiff Andrea Snider worked at Brown County's Department of Public Safety's Communications Center for over two decades. (Plaintiff's Dep., Doc. 16-1, Pg. ID 645-46.) Throughout this timeframe, she served as a 911 Dispatcher, a 911 Supervisor, and the 911 Manager. (*Id.* at Pg. ID 598.) Attempting to continue this trajectory, Plaintiff sought promotion to serve as the Director of Public Safety. (*Id.* at Pg. ID 615.) Defendant Brown County Board of Commissioners ultimately selected a man outside of Brown County's

Communications Center to fill this role. (*Id.* at Pg. ID 611.) Not long after hearing the news, Plaintiff requested and received leave under the Family and Medical Leave Act ("FMLA"). (*Id.* at Pg. ID 620.) Just days after returning to work, however, Plaintiff received a termination letter stating that her position had been abolished because "there is not sufficient work or staffing to necessitate a full-time [911] Manager position over the Communications Center." (Termination Letter, Doc. 16-2, Pg. ID 732.) Plaintiff now brings claims against Defendant Brown County, Ohio, and Defendant Brown County Board of Commissioners for sex discrimination—specifically premised upon failure to promote and termination—as well as FMLA retaliation. (*See* Compl., Doc. 1.)

## I.    The Director of Public Safety Position

First, an introduction of the pertinent decision-makers and organizational structure is in order. Barry Woodruff, Tony Applegate, and Daryll Gray served as the Brown County Board Commissioners during the relevant timeframe. (Woodruff Dep., Doc. 11-1, Pg. ID 78.) Together, they were responsible for hiring and terminating certain employees, such as the new Director of Public Safety, as well as appropriating funds. (*Id.* at Pg. ID 65, 71, 145.) Decisions were made through a majority vote. (*Id.* at Pg. ID 81.) Sarah Beath served as the County Administrator and also shared her input with the Commissioners as they selected the new Director. (*Id.* at Pg. ID 73; Beath Dep., Doc. 14-1, Pg. ID 359, 429.) At the end of the day, though, this hiring decision was in the hands of the Commissioners. (Beath Dep., Doc. 14-1, Pg. ID 429.)

Barbara Davis served as the Director from January 2017 until July 2023. (Davis Affidavit, Doc. 17-1, Pg. ID 766-67.) The Director is responsible for overseeing the 911 Call

2

Center and the Emergency Management Agency. (*Id.* at Pg. ID 767.) In August 2021, Davis recommended the creation of the 911 Manager position to help handle some administrative duties. (*Id.*; Plaintiff's Dep., Doc. 16-1, Pg. ID 603.) The Commissioners approved the 911 Manager position and Plaintiff's elevation to this new role through a majority vote, but Woodruff voted against this course of action. (Meeting Minutes, Doc. 11-2, Pg. ID 191.) The 911 Manager position was characterized as "a new administrative position" in which Plaintiff would be the "second in command and responsible to oversee the dispatch supervisors." (*Id.*) She was also expected to "fill in as needed to sustain operations." (*Id.*) From his perspective, Woodruff explained that this 911 Manager position was also created so that someone could "run . . . the show" if something happened to the Director. (Woodruff Dep., Doc. 11-1, Pg. ID 128.) Though Davis may have viewed this as "part of succession planning," Plaintiff understood that the selection of the next Director was up to the Commissioners. (Davis Affidavit, Doc. 17-1, Pg. ID 767; Plaintiff's Dep., Doc. 16-1, Pg. ID 600.)

Davis's relationship with the Commissioners began to deteriorate over the years. (*See, e.g.*, Davis Affidavit, Doc. 17-1, Pg. ID 768; Gray Dep., Doc. 12-1, Pg. ID 227.) In particular, the Commissioners had concerns about turnover and also considered some of the technological decisions made by Davis to be costly and ineffective. (Woodruff Dep., Doc. 11-1, Pg. ID 115-19, 123-24; Beath Dep., Doc. 14-1, Pg. ID 370-71.) Outgoing employees voiced concerns about Davis's and Plaintiff's leadership and conduct. (Plaintiff's Dep., Doc. 16-1, Pg. ID 660; Woodruff Dep., Doc. 11-1, Pg. ID 103; Exit Interviews, Doc. 14-3, Pg. ID 542.) Additionally, the Commissioners questioned and

3

ultimately denied Davis's attempts to hire a 911 Dispatcher who was previously terminated from his prior dispatcher position in a neighboring county. (Daulton Dep., Doc. 13-1, Pg. ID 280-83; Beath Dep., Doc. 14-1, Pg. ID 368-69.) Davis resigned in July 2023. (Davis Affidavit, Doc. 17-1, Pg. ID 766-68; Woodruff Dep., Doc. 11-1, Pg. ID 119.) Plaintiff then began performing both 911 Manager duties and Director duties, but the Commissioners denied her request to be formally promoted to the position of Acting Director. (Plaintiff's Dep., Doc. 16-1, Pg. ID 606, 620.)

Accordingly, Davis's exit left the Commissioners advertising and searching to fill the Director position. (Applegate Dep., Doc. 15-1, Pg. ID 564; Beath Dep., Doc. 14-1, Pg. ID 420-21.) The Commissioners interviewed four individuals, including Plaintiff and Daulton. (Beath Dep., Doc. 14-1, Pg. ID 421-22, 426; Woodruff Dep., Doc. 11-1, Pg. ID 154-56.) Ultimately, Daulton was hired for the Director position through a majority vote in which Woodruff and Applegate supported him. (Woodruff Dep., Doc. 11-1, Pg. ID 105; Applegate Dep., Doc. 15-1, Pg. ID 572.) Gray did not vote in support of Daulton, but the reasons appear to be unrelated to Daulton's merits. (Gray Dep., Doc. 12-1, Pg. ID 236-37.) Additionally, Gray would not have hired Plaintiff or any other candidate. (*Id.* at Pg. ID 237.)

## II. Plaintiff's Termination

On August 16, 2023, soon after learning that she had not been promoted to serve as the Director, Plaintiff requested leave under the FMLA. (Plaintiff's Dep., Doc. 16-1, Pg. ID 617-19, 630, 646, 657; FMLA Letter, Doc. 16-2, Pg. ID 711.) Plaintiff remained on FMLA leave until Friday, September 15, 2023, when she returned to work. (Plaintiff's Dep., Doc.

4

16-1, Pg. ID 620, 635.) The following business day, Monday, September 18, 2023, Daulton notified Plaintiff that the 911 Manager position was abolished as of "today's date" due to insufficient "work or staffing" for the role. (Daulton Dep., Doc. 13-1, Pg. ID 312; Termination Letter, Doc. 16-2, Pg. ID 732.) Two days later, the Commissioners unanimously voted to simultaneously abolish the 911 Manager position and create a new Administrative Assistant position. (Meeting Minutes, Doc. 14-2, Pg. ID 514.) And, as of September 22, 2023, two full-time openings were made available: the Administrative Assistant position and another 911 Supervisor position. (Posted Openings, Doc. 16-2, Pg. ID 733-34.) The Commissioners also hired two additional part-time 911 Dispatchers on September 25, 2023. (Meeting Minutes, Doc. 19-3, Pg. ID 785.)

According to Daulton, he and the Commissioners jointly decided to eliminate the 911 Manager position. (Daulton Dep., Doc. 13-1, Pg. ID 288-89, 312; Gray Dep., Doc. 12-1, Pg. ID 235.) This position was unnecessary in Daulton's estimation due to the lack of work and the small size of the team. (Daulton Dep., Doc. 13-1, Pg. ID 301.) Woodruff, for his part, testified that the three Commissioners made the determination that the 911 Manager position was not needed. (Woodruff Dep., Doc. 11-1, Pg. ID 161-62.) Applegate testified that this position was abolished due to the lack of work. (Applegate Dep., Doc. 15-1, Pg. ID 573.)

Although the Administrative Assistant role had a new title, Plaintiff had previously performed all of these same duties — plus additional duties — as 911 Manager. (Plaintiff's Dep., Doc. 16-1, Pg. ID 640-41; Administrative Assistant Posting; Doc. 16-2, Pg. ID 733.) Plaintiff was not invited to apply for the Administrative Assistant position or the

5

911 Supervisor position. (Plaintiff's Dep., Doc. 16-1, Pg. ID 640-41.) The Communications Center was operating at "critically low staffing levels" around this time. (Daulton Dep., Doc. 13-1, Pg. ID 304.)

### III. Procedural Posture

Plaintiff filed her Complaint on April 9, 2024. (*See* Compl., Doc. 1.) Specifically, she alleges sex discrimination by way of failure to promote and termination, as well as FMLA retaliation. (*Id.*) The parties then proceeded with discovery. On July 29, 2025, Defendants filed a Motion for Summary Judgment (Doc. 17), which has since been fully briefed. (*See* Response, Doc. 21; Reply, Doc. 22.)

### LAW

A court must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). In making this determination, a court views the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party has the burden to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). This can be accomplished by pointing out the lack of admissible evidence to support the nonmoving party's case. *See* Fed. R. Civ. P. 56(c)(1)(B); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001). If the moving party meets this burden, it then becomes the nonmoving party's responsibility to put forth affirmative evidence to

6

demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Notably, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). To preclude summary judgment, the nonmoving party must point to probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Id.* If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

As confirmed by the Sixth Circuit, a court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *see also* Fed. R. Civ. P. 56(c)(3) (explaining that "the court need consider only the cited materials"). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). Additionally, "[c]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." *Gooden*

*v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## ANALYSIS

Where, like here, workplace-discrimination claims lack direct evidence of discrimination, courts apply the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021). Assuming the plaintiff accomplishes this, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action." *Id.* If so, "the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful discrimination." *Id.*

The Court first turns to Plaintiff's sex discrimination claims (failure to promote and termination) and then considers Plaintiff's FMLA retaliation claim. Each claim is subject to the similar well-traveled *McDonnell Douglas* framework. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).

## I.     Sex Discrimination: Failure to Promote

Plaintiff alleges that Defendants discriminated against her on the basis of sex when they failed to promote her to the Director position and, instead, selected Dominick Daulton—an allegedly less qualified male applicant. (Compl., Doc. 1, ¶¶ 30-43.) Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such

8

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Though Plaintiff's failure-to-promote claims are brought under both Title VII and the Ohio Revised Code, they rise or fall together since the same governing standard applies. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 n.2 (6th Cir. 2000).

To demonstrate a prima facie case for a failure-to-promote claim, a plaintiff must demonstrate that: "(1) [s]he is a member of a protected class; (2) [s]he applied for and was qualified for a promotion; (3) [s]he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions" at the time. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000). Defendants do not dispute that Plaintiff can meet her prima facie burden. (Motion, Doc. 17, Pg. ID 755.) Plaintiff was a qualified woman who applied for the Director position but did not receive it; instead, Daulton was chosen. She therefore satisfies the prima facie stage.

Moving ahead, Defendants argue that they had legitimate, nondiscriminatory reasons for hiring Daulton instead of promoting Plaintiff: "(1) the Commissioners did not want to replace Ms. Davis with another iteration of the same and (2) Mr. Daulton's technological knowledge and experience managing a larger staff proved more impressive and desirable than [Plaintiff's] experience working in the Communications Center as 911 Manager." (Motion, Doc. 17, Pg. ID 755.) In other words, Defendants contend that Daulton was the most qualified candidate for the job. (*Id.* at Pg. ID 756.) Hiring a more qualified candidate constitutes a legitimate, nondiscriminatory reason for Defendants' action, so Defendants have met their burden at this step. *See Provenzano v. LCI Holdings,*

9

*Inc.*, 663 F.3d 806, 815 (6th Cir. 2011); *Hammond v. Sysco Corp.*, No. 23-5385, 2023 WL 8847365, at *6 (6th Cir. Dec. 21, 2023).

Accordingly, Plaintiff's failure-to-promote claims turn on the pretext inquiry: whether Plaintiff has "present[ed] evidence from which a jury could reasonably find that the employer's proffered reason for the adverse employment action was not the real reason that it discharged her and that unlawful [sex] discrimination was the true reason." *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 347 (6th Cir. 2015). Pretext is often demonstrated "by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). However, these categories are not meant to unduly restrict a court's "commonsense" analysis of the ultimate inquiry: "did the employer [engage in the adverse action] for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009); *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quotation omitted). At the summary judgment stage, a plaintiff "need only rebut the employer's proffered rationales," not "disprove them." *Moffat*, 624 F. App'x at 348. While courts "will not micro-manage the process used by employers in making their employment decisions, [courts] also will not blindly assume that an employer's description of its reasons is honest." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quotations omitted).

Within the failure-to-promote context, the Sixth Circuit has framed a specific variant of pretext as follows:

> Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination.

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (cleaned up).

Plaintiff argues that Defendants' proffered reasons—(1) not wanting to replace Davis with another iteration of the same, and (2) Daulton's superior technological skills and prior experience—are undercut by the record. (Response, Doc. 21, Pg. ID 807.) Furthermore, Plaintiff highlights allegedly contradictory testimony and also argues that a question remains as to whether she was even seriously considered as a candidate. (*Id.*)

The record demonstrates that the Commissioners shared concerns regarding the trajectory of the Communications Center's management due to high turnover and the work environment. (Woodruff Dep., Doc. 11-1, Pg. ID 119, 123, 130 (testifying that Plaintiff was not the right person for the job due to turnover issues); Gray Dep., Doc. 12-1, Pg. ID 232-33 (testifying that a change in management was necessary due to the exit interviews describing the cliques); Applegate Dep., Doc. 15-1, Pg. ID 563 (testifying that the "911 Center was not seeming to run very well overall while [Plaintiff] was in [the 911 Manager] position" due to "employee turnover and employee morale issues"); *see also* Beath Dep., Doc. 14-1, Pg. ID 433-34 (testifying that she understood that Plaintiff had created a toxic work environment leading to high turnover)).

While Plaintiff may disagree over whether she should have been held responsible for these issues as 911 Manager, this alone does not demonstrate pretext. *See Brown v.*

*Kelsey-Hayes Co.*, 814 F. App'x 72, 81 (6th Cir. 2020) (cleaned up) ("disagreeing with an employer's assessment of performance does not render the employer's reasons pretextual"). Consider things from the Commissioners' perspective. Plaintiff would often join Davis at meetings with the Commissioners and have an opportunity to speak. (Beath Dep., Doc. 14-1, Pg. ID 401.) In her role as 911 Manager, Plaintiff was "second in command and responsible to oversee the dispatch supervisors." (Meeting Minutes, Doc. 11-2, Pg. ID 191.) She was also expected to "fill in as needed to sustain operations." (*Id.*) Accordingly, as Woodruff saw it, Plaintiff had ample opportunity to provide input with Davis. (Woodruff Dep., Doc. 11-1, Pg. ID 144.)

Accordingly, Plaintiff has not shown that the Commissioners' reason for seeking to change the trajectory of management was pretextual rather than grounded in an honest business judgment given their understanding at the time. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (quotation omitted) ("An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made."). Notably, "Where the employer asserts more than one reason for the adverse employment decision, the plaintiff must prove that each reason is pretextual." *Philbrick v. Holder*, 583 F. App'x 478, 490 (6th Cir. 2014); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998) (explaining that there may be some situations "in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment"). The Court keeps this framing in mind as it proceeds to the remaining issues.

12

Plaintiff further contends that she had impressive technological skills and experience, and that she was not considered on her own terms in comparison to Daulton. (Response, Doc. 21, Pg. ID 808 (citing Recommendation Letters, Doc. 11-2, Pg. ID 196, 199, 201, 203-07)). According to Woodruff, "keeping up with the technology" was one of the most significant challenges for the Communications Center. (Woodruff Dep., Doc. 11-1, Pg. ID 87.) And, the Commissioners were aware of the technological problems while Plaintiff was 911 Manager. (*See id.* at Pg. ID 115-18; Beath Dep., Doc. 14-1, Pg. ID 370-71.) The Commissioners reviewed Plaintiff's letters of recommendation. (Applegate Dep., Doc. 15-1, Pg. ID 565.) At the same time, as Defendants point out, the Commissioners found Daulton's technological experience—especially in his role leading a larger staff— to be particularly impressive. (Reply, Doc. 22, Pg. ID 980; Woodruff Dep., Doc. 11-1, Pg. ID 120, 156-57; Beath Dep., Doc. 14-1, Pg. ID 431; Daulton Dep., Doc. 13-1, Pg. ID 261 (explaining that he was "basically responsible for all of the technology at the 911 Center" in his previous role)). Plaintiff held roughly twenty-six years of experience with the Communications Center, but Daulton also brought twenty-eight years of public safety and emergency services experience to the table. (Plaintiff's Dep., Doc. 16-1, Pg. ID 598, 645-46; Cover Letter, Doc. 13-2, Pg. ID 327-32.) For all these reasons, Plaintiff has not shown that she was a "plainly superior candidate" or otherwise pointed to probative evidence of discrimination regarding the Commissioners' review of her qualifications on this score. *See Provenzano*, 663 F.3d at 815.

Plaintiff also faults the Commissioners for not contacting her references. (Response, Doc. 21, Pg. ID 810; Woodruff Dep., Doc. 11-1, Pg. ID 152; Beath Dep., Doc.

14-1, Pg. ID 461.) However, she points to no evidence that such references were ever requested as part of the application process or that the Commissioners contacted the references of other candidates per a standard practice. Nor does Plaintiff provide any authority to suggest that an employer is obligated to contact a candidate's references— let alone when, as here, the employer had concerns about the suitability of the candidate for the role. In any event, the letters do not make Plaintiff a superior candidate to Daulton given Daulton's experience and skills explored above.

Next, the Court considers Plaintiff's interview performance in relation to Daulton's interview performance. The Sixth Circuit has approved an employer's use of "subjective factors like attitude, self-confidence, teamwork, and other nondiscriminatory criteria in its evaluation process." *Solis v. Ohio State Univ. Wexner Med. Ctr.*, No. 24-3230, 2024 WL 4579501, at *6 (6th Cir. Oct. 25, 2024) (citing *Conner v. State Farm Mut. Auto. Ins. Co.*, 273 F. App'x 438, 443 (6th Cir. 2008)); *see also McDaniels v. Plymouth-Canton Cmty. Sch.*, 755 F. App'x 461, 470 (6th Cir. 2018) (explaining that employers may give greater weight to some qualifications over others). Plaintiff's sense of entitlement and negative attitude were common themes that the Commissioners took away from Plaintiff's interview. (Woodruff Dep., Doc. 11-1, Pg. ID 125-26, 146-47; Applegate Dep., Doc. 15-1, Pg. ID 565; Beath Dep., Doc. 14-1, Pg. ID 414-15.) In contrast, the Commissioners who voted to hire Daulton were impressed by his interview performance. (Woodruff Dep., Doc. 11-1, Pg. ID 125-26, 154; Applegate Dep., Doc. 15-1, Pg. ID 570; Beath Dep., Doc. 14-1, Pg. ID 431-32.)

14

Plaintiff, to be sure, highlights that Woodruff at one point testified that Plaintiff had "interviewed well" but later testified that he was "not pleased with her interview." (Woodruff Dep., Doc. 11-1, Pg. ID 141, 146.) Reading Woodruff's testimony in context proves helpful in sorting this out. *See Hill v. Century Arms, Inc.*, 760 F. Supp. 3d 576, 598 (E.D. Tenn. 2024) (declining to read the selected deposition quotations "in a vacuum"). While it is true that Woodruff stated he was "not pleased with [Plaintiff's] interview," he immediately followed up this sentence by stating, "I think she interviewed fairly poorly compared to the other folks we had already interviewed." (Woodruff Dep., Doc. 11-1, Pg. ID 146.) Thus, even crediting this discrepancy in Plaintiff's favor that she did interview "well" in Woodruff's estimation, at no point does Woodruff testify that Plaintiff interviewed better than Daulton—quite the contrary. (*See id.* at Pg. ID 146, 125-26, 154 (explaining that Plaintiff had "scored last")). And, even if Plaintiff believes that her interview performance should rank above Daulton's, this argument fails to convince. *See Solis*, 2024 WL 4579501, at *6 (Although the plaintiff "may oppose the interviewers' ultimate conclusions about how she faired throughout the interview process," this alone does not show discriminatory motive.); *Meyrose v. Vitas Hospice Servs., LLC*, No. 19-CV-91, 2021 WL 5139478, at *11 (E.D. Ky. Nov. 3, 2021), *aff'd*, No. 21-6124, 2022 WL 3046969 (6th Cir. Aug. 2, 2022) (crediting a better interview performance).

Apart from this, Plaintiff brings up a comment in which Woodruff purportedly invited Brian Klein to apply for the Director position. (Response, Doc. 21, Pg. ID 811.) This shows pretext, according to Plaintiff, because she was more qualified than Klein. (*Id.*) The record is unclear as to what Woodruff exactly told Klein since Woodruff does

15

not recall and Beath does not "exactly remember how it was worded." (Woodruff Dep., Doc. 11-1, Pg. ID 158; Beath Dep., Doc. 14-1, Pg. ID 443-44.) Beath testified that Woodruff made a comment that could have easily been interpreted as inviting Klein to apply for the Director position. (Beath Dep., Doc. 14-1, Pg. ID 443-44; *see also* Plaintiff's Dep., Doc. 16-1, Pg. ID 607 (explaining that Klein conveyed to her that he may have been under the impression that the job was offered to him)). However, Woodruff quickly followed this comment up with a clarifying statement that "of course all people should apply that are interested." (Beath Dep., Doc. 14-1, Pg. ID 444; *see also* Woodruff Dep., Doc. 11-1, Pg. ID 158 (testifying that he "automatically" encourages interested applicants for a position to apply)). The fact that Woodruff may have wanted to expand the applicant pool for the open position does not cut against the proffered legitimate reasons for not promoting Plaintiff. In any event, Plaintiff does not pinpoint any record evidence that Klein ever applied for the position or was considered for the role by the Commissioners. (Woodruff Dep., Doc. 11-1, Pg. ID 81 (outlining the Commissioners' majority-approval requirement)). This line of reasoning fails to persuade. And, even if this argument did carry water, it would not frustrate Defendants' independent nondiscriminatory reason for not promoting Plaintiff: the desire to change the trajectory of current management.

Moving on, Plaintiff points to statements made by Beath that allegedly demonstrate gender-based discrimination. (Response, Doc. 21, Pg. ID 811.) For instance, Beath testified that she did not consider Plaintiff to be "overly professional" for a host of reasons, including Plaintiff's attire, abundant jewelry, and visible tattoos. (Beath Dep., Doc. 14-1, Pg. ID 408-15, 418.) "Generally, discriminatory comments can qualify as

16

evidence that a particular decision was discriminatory if the speaker was in a position to influence the alleged decision." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (quotation omitted). While Beath herself did not have voting power over the promotional decision, the record demonstrates that the Commissioners sought Beath's input in making the promotional decision. (Beath Dep., Doc. 14-1, Pg. ID 429.) In turn, Beath recommended against promoting Plaintiff. (*Id.* at Pg. ID 432.) On a slightly different note, Plaintiff also points to evidence suggesting that Davis's perfume would "physically bother[]" Woodruff and that the glitter from her clothing had to be vacuumed up. (*Id.* at ID 372-73.)

Precedent instructs that "isolated and ambiguous comments will not support a finding of discrimination." *Griffin*, 689 F.3d at 596 (quotation omitted). Here, the parties dispute whether Beath's and Woodruff's statements relate to gender stereotypes and support a finding of sex discrimination. The cases cited by Plaintiff stand for the proposition that sex discrimination may include situations in which an employer "evaluate[d] employees by assuming or insisting that they *matched* the stereotype associated with their group." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (emphasis added); (Response, Doc. 21, Pg. ID 811); *see also Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 763 (6th Cir. 2006) (explaining that this line of case law relates to scenarios "where gender non-conformance is demonstrable through the plaintiff's appearance or behavior"). Defendants contend that Plaintiff makes no argument that she was stereotyped for not conforming with gender expectations. (Reply, Doc. 22, Pg. ID 983.)

Moreover, Beath recounted these statements in response to a deposition question about Plaintiff's professionalism, and these statements appear to largely turn on professionalism standards. Courts have considered much more gender-pointed language to fall short of showing the discriminatory animus sufficient to survive summary judgment. *See, e.g., Slapak v. Tiger Mgmt. Grp., LLC*, 594 F. App'x 290, 295-96 (6th Cir. 2014); *Horn v. City of Cleveland*, 674 F. App'x 511, 517 (6th Cir. 2017) (finding that the employer's reference that "this is a man's job" was, among other reasons, too unclear to preclude summary judgment); *Meyrose*, 2021 WL 5139478, at *12 (collecting cases in which "blatant and facially discriminatory remarks" could qualify as "other probative evidence of discrimination"). Thus, while the Court keeps these comments in mind as it considers the constellation of evidence as a whole, they are not dispositive.

Finally, in Plaintiff's estimation, Defendants' claim that Daulton was hired, at least in part, because they wanted to save money is undercut by three facts: (1) Daulton was paid $25,000 more than his predecessor, (2) all Communications Center employees were given raises, and (3) additional staff members were hired once Daulton took the reins. (Response, Doc. 21, Pg. ID 809.) As an initial matter, Defendants do not explicitly rely on cost reductions in their briefing as a reason for hiring Daulton, and Plaintiff's specific citation to Woodruff's testimony does not bear this out either. (*See* Motion, Doc. 17; Response, Doc. 21, Pg. ID 809 (citing Woodruff Dep., Doc. 11-1, Pg. ID 118-19)). In other words, this argument does not cast doubt on Defendants' twin proffered reasons for hiring Daulton: they wanted a change in management trajectory and considered Daulton to be more qualified.

Additionally, the record places these budgetary business decisions within a broader context. Woodruff testified that the American Rescue Plan made more funding available around this timeframe. (Woodruff Dep., Doc. 11-1, Pg. ID 120-21.) The record also contains detailed reasons highlighting why this salary was required to incentivize Daulton to accept the position and thereafter benefit the Communications Center. (*See, e.g.*, Gray Dep., Doc. 12-1, Pg. ID 242 (explaining that you may have to pay more "after you interview people or look at the market"); Applegate Dep., Doc. 15-1, Pg. ID 573 (explaining that "a higher quality candidate would require higher compensation")). Specifically, Beath explained that Daulton's technological skills and experience were expected to save the Communications Center money in the future. (Beath Dep., Doc. 14-1, Pg. ID 463-64.) Thus, Plaintiff's argument fails to convince.

While the Court views all this evidence in the light most favorable to Plaintiff, it concludes that Plaintiff has not put forth sufficient evidence for a juror to reasonably find pretext. Notably, "if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination . . . occurred," the employer is entitled to summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). The Sixth Circuit has also granted "great flexibility to employers when selecting management personnel [and] has explicitly held that the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) (cleaned up); *see Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). As no reasonable juror would find pretext in

19

Plaintiff's favor on this record, Defendants are entitled to summary judgment on Plaintiff's failure-to-promote claims.

## II.     Sex Discrimination: Termination

Plaintiff also alleges that Defendants discriminated against her on the basis of sex by terminating her employment and treating her less favorably than similarly situated employees. (Compl., Doc. 1, ¶¶ 30-43.) These claims are brought under both Title VII and the Ohio Revised Code, but they once again run on parallel tracks due to a shared analysis. *See Myers v. Cuyahoga Cnty., Ohio*, 182 F. App'x 510, 517 n.3 (6th Cir. 2006); *Cincinnati Bar Ass'n. v. Young*, 731 N.E.2d 631, 639 (Ohio 2000).

To begin, a plaintiff alleging sex discrimination bears the burden of establishing that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). However, in cases involving a reduction in force, the fourth prong is substituted with a heightened standard: "rather than showing that she was replaced, the plaintiff must present direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (quotation omitted); *see also Slapak v. Tiger Mgmt. Grp., LLC*, 594 F. App'x 290, 294 (6th Cir. 2014) (applying this modified final prong in the Title VII gender discrimination context).

As a threshold matter, the parties dispute whether Plaintiff's termination should be viewed through a reduction-in-force analysis. (*See* Motion, Doc. 17, Pg. ID 757-61; Response, Doc. 21, Pg. ID 813-15.) A reduction in force occurs "when an employer eliminates an employee's position because of business considerations and does not replace that employee after her discharge." *Thompson*, 985 F.3d at 522 n.6; *see also Wilson v. Ohio*, 178 F. App'x 457, 465 (6th Cir. 2006) (emphasizing the question of replacement as the "key inquiry"); *Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 488 (6th Cir. 2012) ("Eliminating a single job is sufficient to constitute a legitimate reduction in force."). "A person is considered replaced 'only when another employee is hired or reassigned to perform the plaintiff's duties.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Conversely, "A person is not considered replaced when [her] duties are absorbed by another person 'or when the work is redistributed among other existing employees already performing related work.'" *Id.* (quoting *Barnes*, 896 F.2d at 1465).

The Court begins by examining the nature of the 911 Manager position and its accompanying duties. At the time of its inception, the 911 Manager position was characterized as "a new administrative position" in which Plaintiff would be the "second in command and responsible to oversee the dispatch supervisors." (Meeting Minutes, Doc. 11-2, Pg. ID 191.) Plaintiff was also expected to "fill in as needed to sustain operations." (*Id.*) On September 22, 2023, four days after Plaintiff was told that the 911 Manager position had been abolished, Defendants created a new Administrative Assistant position and another 911 Supervisor position. (Posted Openings, Doc. 16-2, Pg.

21

ID 733-34.) Plaintiff testified that she had previously performed all of the duties assigned to this new Administrative Assistant position. (Plaintiff's Dep., Doc. 16-1, Pg. ID 639-40.) Recall that the 911 Manager position was initially created so that someone "could handle some administrative things in the building." (*Id.* at Pg. ID 603; *see also* Beath Dep., Doc. 14-1, Pg. ID 397.) At the same time, Plaintiff recognized that she performed additional duties as 911 Manager that went beyond the Administrative Assistant role—at least as defined by the Administrative Assistant's job description. (Plaintiff's Dep., Doc. 16-1, Pg. ID 639-40.) Notably, the job description for the Administrative Assistant position also included the open-ended classification of "other various duties as assigned by [the] Director." (Administrative Assistant Opening, Doc. 16-2, Pg. ID 733.)

Thus, this situation does not fit neatly within *Geiger*'s contours of what does or does not qualify as replacement. Because Defendants created a new Administrative Assistant position to perform—at the very least—a significant subset of Plaintiff's duties, this supports Plaintiff's replacement theory. *See Geiger*, 579 F.3d at 623; *Clark v. Rest. Growth Servs., LLC*, No. 3:24-CV-825, 2025 WL 1463159, at *4 (M.D. Tenn. May 21, 2025) ("In the same vein, the record contains sufficient evidence for a reasonable jury to find that Chaney took over Clark's position without performing other duties, as opposed to taking over Clark's duties in addition to her own."); *Barnes*, 896 F.2d at 1465 n.10 (cautioning that "an employer [cannot] avoid liability by changing the job title or by making minor changes to a job indicative of an attempt to avoid liability"). Simultaneously, Defendants contend that some of Plaintiff's other duties were allocated to Daniel Cayse (a newly-hired 911 Supervisor) as well as Daulton in his Director role.

22

(Reply, Doc. 22, Pg. ID 990-91.) *See Barnes*, 896 F.2d at 1465 (emphasis added) (explaining that there is no replacement when the work is "redistributed among other *existing employees already performing related work*"); *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997) ("This type of reassignment is analogous to hiring a new employee to cover the terminated employee's duties.").

The case at bar therefore differs from a straightforward reduction-in-force situation, such as when two positions were combined into one to reduce headcount. *See Wilson*, 178 F. App'x at 465. A sister district court's reasoning for finding a material issue of fact as to whether a reduction in force occurred is particularly apt here: "these facts fall short of showing that another employee was assigned to perform [the plaintiff's] duties *in addition to other duties*, or that [the plaintiff's] work was redistributed among other existing employees *already performing related work*." *Clark*, 2025 WL 1463159, at *5; *see also Brebberman v. City of Maumee, Ohio*, No. 3:21-CV-1881, 2023 WL 4663044, at *2 (N.D. Ohio July 20, 2023), *aff'd*, (6th Cir. Apr. 22, 2024) (finding a reduction in force because the plaintiff's duties were fully distributed among existing employees and no new employees were hired).

Viewing the record in the light most favorable to Plaintiff, the Court therefore concludes that a question of material fact remains as to whether Plaintiff was replaced as part of a reduction-in-force situation. Accordingly, the heightened prima facie standard is not applicable at this juncture. *See Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 539 (6th Cir. 2014); *Anderson v. Otis Elevator Co.*, 923 F. Supp. 2d 1032, 1060 (E.D. Mich. 2013) ("[I]f Plaintiffs had been able to demonstrate a genuine factual dispute regarding

23

the existence of the [reduction in force], applying the additional evidentiary burden required in the case of a [reduction in force] would be inappropriate."); *Klumpp v. Uniloy, Inc.*, No. 22-CV-11188, 2024 WL 6901279, at \*5 (E.D. Mich. Sept. 11, 2024) (quotation omitted) ("When sufficient evidence exists supporting a finding that Plaintiffs were terminated for a reason other than a reduction in force, Plaintiffs are not required to meet the heightened fourth prong of a *prima facie* case.").

Consequently, Plaintiff must show that "she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier*, 388 F.3d at 987. Neither party definitively identifies the person who initially filled the Administrative Assistant role. (*See* Response, Doc. 21, Pg. ID 812-15); *Marano v. Aircraft Braking Sys., Inc.*, 138 F. Supp. 2d 940, 950 (N.D. Ohio 2001) (finding that the lack of information relating to the replacement's age weighed in favor of the defendant). If anything, the record suggests that the Administrative Assistant was, at least one point in time, a person named Beth Felts. (Reply, Doc. 22, Pg. ID 988 (citing Organizational Chart, Doc. 13-2, Pg. ID 338); *see also* Daulton Dep., Doc. 13-1, Pg. ID 315-16.)

Instead, Plaintiff focuses her argument upon Daniel Cayse — the man who was hired for the 911 Supervisor position. Specifically, Plaintiff posits that a material question remains "given the evidence that [Plaintiff's] 911 Manager position which encompassed supervisor and dispatcher duties was eliminated for the very purpose of hiring a fourth supervisor and replacing [Plaintiff] with Cayse." (Response, Doc. 21, Pg. ID 812.) Defendants rebut that evidence of some job overlap does not necessarily mean that an

employee was replaced. (Reply, Doc. 22, Pg. ID 989.) While Plaintiff testified that her duties as 911 Manager included supervising the 911 Supervisors, the record also bears out that she was expected to fill different roles as needed. (Plaintiff's Dep., Doc. 16-1, Pg. ID 650; Meeting Minutes, Doc. 11-2, Pg. ID 191.) *See U.S. Equal Emp. Opportunity Comm'n v. Ohio State Univ.*, No. 2:20-CV-4624, 2022 WL 4368127, at *5 (S.D. Ohio Sept. 21, 2022) (allowing the claim to proceed when the parties disputed the extent of duty reassignment to a purported replacement).

Thus, in light of this record, the Court finds that a reasonable juror could determine that Plaintiff was replaced by a man or otherwise treated differently than Cayse. In arriving at this conclusion, the Court keeps in mind that the burden of demonstrating a prima facie case "is not onerous and [is] easily met." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (quotations omitted).

Proceeding to the next stage, Defendants proffer that they terminated Plaintiff because her position was eliminated in line with a reduction-in-force reorganization. (Motion, Doc. 17, Pg. ID 763.) This suffices as a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Madry v. Gilbraltar Nat'l. Corp.*, 526 F. App'x. 593, 597 (6th Cir. 2013) ("We have previously found that the restructuring of a business was a legitimate, nondiscriminatory reason for terminating an employee . . . ."); *Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 492 (6th Cir. 2012) ("Evidence of an employer's business restructuring, which may include the elimination of jobs or termination of otherwise competent employees based on seniority, satisfies the employer's burden of producing a legitimate, non-discriminatory reason for a plaintiff's termination.").

25

Now, the burden shifts back to Plaintiff to demonstrate that this proffered reason is merely pretext. To meet this burden, a plaintiff must "present evidence from which a jury could reasonably find that the employer's proffered reason for the adverse employment action was not the real reason that it discharged her and that unlawful [sex] discrimination was the true reason." *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 347 (6th Cir. 2015). At the summary-judgment stage, a plaintiff "need only rebut the employer's proffered rationales," not disprove them. *Id.* at 348. While courts "will not micro-manage the process used by employers in making their employment decisions, [courts] also will not blindly assume that an employer's description of its reasons is honest." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quotations omitted). "A [reduction in force] is not an open sesame to discrimination and thus may not be used as a disguised adverse action to remove or demote a particular employee." *Passmore v. Mapco Express, Inc.*, 447 F. Supp. 3d 654, 666 (M.D. Tenn. 2017) (cleaned up).

First, the Court considers the timing of Plaintiff's termination in relation to the proffered reduction-in-force plan. On September 18, 2023, Daulton notified Plaintiff that the 911 Manager position was "abolished *effective today's date*" due to insufficient "work or staffing" for the role. (Termination Letter, Doc. 16-2, Pg. ID 732 (emphasis added); Daulton Dep., Doc. 13-1, Pg. ID 311-12; Notes, Doc. 13-2, Pg. ID 336.) However, the record contradicts this date. It was not until September 20, 2023, that the Commissioners unanimously voted to abolish the 911 Manager position. (Meeting Minutes, Doc. 14-2, Pg. ID 514.) While this cart-before-the-horse termination was flagged by Plaintiff (Response,

26

Doc. 21, Pg. ID 818), Defendants fail to provide any explanation for this discrepancy. Thus, the Court finds this timeline relevant to the pretext analysis.

Moreover, Defendants' reduction-in-force justification, as explored above, did not involve a reduction in the number of employees or a redistribution of work to exclusively preexisting employees. (Response, Doc. 21, Pg. ID 818); *see Wilson*, 178 F. App'x at 465; *Geiger*, 579 F.3d at 623. Rather, within the same abbreviated timeframe, Defendants created a new Administrative Assistant position, hired a new 911 Supervisor, and hired two additional 911 Dispatchers. (Meeting Minutes, Doc. 19-3, Pg. ID 785; Meeting Minutes, Doc. 14-2, Pg. ID 514; Posted Openings, Doc. 16-2, Pg. ID 733-34.) Although Daulton testified that he did not believe a 911 Manager was needed due to the size of the Communications Center (Daulton, Dep., Doc. 13-1, Pg. ID 301), a juror can reasonably question this rationale due to the immediate hiring for additional roles that included Plaintiff's duties. As the Sixth Circuit has recognized, "an employer may have difficulty hiding behind the workforce-reduction justification if it subsequently replaces the discharged employee." *Bivens v. Zep, Inc.*, 147 F.4th 635, 651 (6th Cir. 2025). Neither party cites to any evidence suggesting that these four individuals were hired due to "changed circumstances that did not exist at the time [Plaintiff] was terminated." *Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 535 (6th Cir. 2006). And, Defendants' citation to *Butler v. Ohio Power Company*, 91 F.3d 143 (Table), 1996 WL 400179, at *6 (6th Cir. 1996), is distinguishable because the new employees in that case performed roles "unrelated to the work" that the plaintiff had previously completed. (Motion, Doc. 17, Pg. ID 764.)

27

Taken together, a reasonable juror could find that Defendants' new hires around the time of terminating Plaintiff contribute to pretext.

Plaintiff also contends that she was not offered — let alone considered for — any of these newly created positions. (Response, Doc. 21, Pg. ID 816, 818.) While Defendants dismiss this argument as improperly raising a failure-to-hire or FMLA interference claim (Reply, Doc. 22, Pg. ID 987, 992, 995), the Court views things slightly differently. Plaintiff alleged in her Complaint that she "was not considered for or notified of these open positions for which she was qualified." (Compl., Doc. 1, ¶ 29.) And, though it is true that Plaintiff does not bring stand-alone claims for Defendants' failure to rehire her or FMLA interference, Plaintiff now marshals this as evidence of pretext for the claims that were pled.

Failure to retain or transfer a defendant throughout a reduction-in-force situation does not necessarily constitute pretext. *Houdeshell v. Council on Rural Serv. Programs, Inc.*, No. 3:23-CV-281, 2024 WL 4817439, at *9 (S.D. Ohio Nov. 18, 2024) (citing *Bender v. Hecht's Dep't. Stores*, 455 F.3d 612 (6th Cir. 2006); *Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 962-63 (6th Cir. 1987)). While "an employer owes no duty to an employee to transfer [her] to another position when the employer reduces its workforce for economic reasons," a material dispute of fact remains as to whether the workforce was actually reduced in this case. *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 313 (6th Cir. 2001).

Here, Defendants did not engage with Plaintiff — seasoned with over two decades of experience with Brown County — about the vacancies despite the Communications Center operating at what Defendants repeatedly describe as "critically low staffing

28

levels." (Reply, Doc. 22, Pg. ID 986-87, 989; *see also* Beath Dep., Doc. 14-1, Pg. ID 471; Daulton Dep., Doc. 13-1, Pg. ID 304.) It is worth emphasizing, once again, that Plaintiff's job duties as the 911 Manager included "fill[ing] in as needed to sustain operations." (Meeting Minutes, Doc. 11-2, Pg. ID 191.) When asked why Plaintiff was not informed of the openings or placed into the vacant 911 Supervisor position, Woodruff responded that it was a "good question" and that he was unsure. (Woodruff Dep., Doc. 11-1, Pg. ID 162-63.) Daulton testified that he did not expect a "cooperative work relationship" with Plaintiff after she made a list of demands, but—at least at one point in time—he "was hoping . . . [to] work with her in some capacity." (Daulton Dep., Doc. 13-1, Pg. ID 301-02, 306.) On this record, a juror could reasonably question the legitimacy of terminating Plaintiff due to a "lack of work" or insufficient staffing. (Applegate Dep., Doc. 15-1, Pg. ID 573; Termination Letter, Doc. 16-2, Pg. ID 732.)

Viewed collectively and within the light most favorable to Plaintiff, the record includes enough evidence for a reasonable juror to find Defendants' proffered reasons for terminating Plaintiff to be pretextual. Thus, Defendants are not entitled to summary judgment as to Plaintiff's termination-based sex discrimination claims.

### III.    FMLA Retaliation

Turning to the final claim, Plaintiff alleges that Defendants retaliated against her for taking leave under the FMLA by terminating her shortly after returning to work. (Compl., Doc. 1, ¶¶ 44-49.) In order to make a prima facie showing on this claim, a plaintiff must demonstrate that "(1) [s]he engaged in an activity protected by the Act; (2) that this exercise of [her] protected rights was known to the defendant; (3) that defendant

thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 404 (6th Cir. 2003); *see also Chapman v. Brentlinger Enters.*, 124 F.4th 382, 401 (6th Cir. 2024).

Defendants appear to proceed under the assumption that Plaintiff can meet each prima facie prong. (*See* Motion, Doc. 17, Pg. ID 762-63.) It is undisputed that Plaintiff engaged in protected activity by requesting and thereafter taking FMLA leave. *Chapman*, 124 F.4th at 402. Defendants were aware of this development. (Beath Dep., Doc. 14-1, Pg. ID 407.) As for causation, the Sixth Circuit has held that temporal proximity can demonstrate causation when there is a short length of time between the protected activity and the adverse employment action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283-84 (6th Cir. 2012) (collecting cases). Plaintiff first took FMLA leave on August 14, 2023; she then returned to work on Friday, September 15, 2023, and was informed of her termination one business day later on Monday, September 18, 2023. (Plaintiff's Dep., Doc. 16-1, Pg. ID 617-20, 630, 635, 646, 657; FMLA Letter, Doc. 16-2, Pg. ID 711; Termination Letter, Doc. 16-2, Pg. ID 732.) This timeline amounts to close temporal proximity suggestive of retaliation. *See, e.g., Seeger*, 681 F.3d at 283 (finding causation when the plaintiff was terminated less than two months after he apprised the defendant of his FMLA leave and three weeks after his return to work); *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (finding the same for a several-month lapse); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding the same for a three-month lapse and when the plaintiff was terminated the day she returned to work).

30

Defendants contend that the value of the 911 Manager position was unsurprisingly reconsidered when Plaintiff put it in the spotlight by seeking assurances on August 31, 2023, that her position would not be eliminated. (Reply, Doc. 22, Pg. ID 993; Documentation, Doc. 13-2, Pg. ID 335.) But, the record is ambiguous as to when and why the relevant decisionmakers began to consider abolishing the 911 Manager position. (Beath Dep., Doc. 14-1, Pg. ID 469; Woodruff Dep., Doc. 11-1, Pg. ID 162; Gray Dep., Doc. 12-1, Pg. ID 235.) Accordingly, in light of the aforementioned chronology, Plaintiff has put forth a prima facie case for FMLA retaliation.

Defendants, once again, rely upon the reduction-in-force reorganization as a legitimate, nondiscriminatory reason for terminating Plaintiff. As established above, a reasonable juror could find this proffered reason to be pretextual. In fact, the timing of Plaintiff's FMLA leave only further bolsters this conclusion. Though temporal proximity cannot serve as the sole basis for pretext, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger*, 681 F.3d at 285 (quotation omitted); *see also Cutcher v. Kmart Corp.*, 364 F. App'x 183, 191 (6th Cir. 2010) (crediting temporal proximity, among other factors, and finding that the plaintiff had shown pretext in an FMLA retaliation case involving a purported reduction in force); *Moore v. Bells Nursing Home, Inc.*, No. 1:22-CV-1173, 2024 WL 6977045, at *9 (W.D. Tenn. Feb. 14, 2024) (denying summary judgment because the plaintiff "was fired within days of returning from FMLA leave" and offered independent evidence to strengthen a reasonable inference of improper motive). This strong foundation of temporal proximity—when paired with the independent reasons to question the reduction in

31

force—evinces pretext. Defendants are not entitled to summary judgment as to Plaintiff's FMLA retaliation claim.

## CONCLUSION

For all these reasons, Defendants' Motion for Summary Judgment (Doc. 17) is **GRANTED IN PART AND DENIED IN PART**. Judgment is **ENTERED** in favor of Defendants as to Plaintiff's sex discrimination claims for failure to promote. Plaintiff's FMLA retaliation claim and claims for sex discrimination due to termination **SHALL PROCEEED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

32